IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| VIRGIE PAULINE JONES,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>RUSHMORE LOAN MANAGEMENT SERVICES, LLC,<br><br>　　　　　　　　　Defendant. | Civil Action No. 3:22-cv-10 |

## COMPLAINT

Plaintiff Virgie Pauline Jones, by counsel, files this Complaint against Defendant Rushmore Loan Management Services, LLC ("Rushmore"). In support of her claims, Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1. The financial crisis of 2007 and 2008 exposed pervasive consumer protection problems in the mortgage servicing industry. *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10700 (Feb. 14, 2013) (codified at 12 C.F.R. pt. 1024) [2013 Regulation X Amendments]. For example, the Government Accountability Office "found pervasive problems in broad segments of the mortgage servicing industry impacting delinquent borrowers, such as servicers who have misled, or failed to communicate with, borrowers, lost or mishandled borrower-provided documents supporting loan modification requests, and generally provided inadequate service to delinquent borrowers." *Id.*

2. As a part of its response to the 2007–08 financial crisis, Congress established the Bureau of Consumer Financial Protection (the "Bureau") and granted it with broad rulemaking,

enforcement, and supervisory powers related to Federal consumer financial law.[1] 12 U.S.C. §§ 5481–5603. Accordingly, the Bureau promulgated rules implementing provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") regarding mortgage loan servicing under the Bureau's rulemaking authority over the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617. These rules amended Regulation X, which are the mortgage servicing rules under RESPA, and also provided an official interpretation. 2013 Regulation X Amendments, 78 Fed. Reg. at 10696; Amendments to the 2013 Mortgage Rules Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z), 81 Fed. Reg. 72160 (Oct. 19, 2016) (codified at 12 C.F.R. pts 1024 & 1026) [2016 Regulation X Amendments].

3. The Bureau's amendments to Regulation X addressed "servicers' obligations to establish reasonable policies and procedures to achieve certain delineated objectives; to provide information about mortgage loss mitigation options to delinquent borrowers; to establish policies and procedures for providing delinquent borrowers with continuity of contact with servicer personnel capable of performing certain functions; and to evaluate borrowers' applications for available loss mitigation options." 2013 Regulation X Amendments, 78 Fed. Reg. at 10696.

4. In particular, the Bureau promulgated several amendments related to loss mitigation requirements. *See* 2016 Regulation X Amendments, 81 Fed. Reg. at 72161. The loss mitigation procedures were meant to respond to the "widespread concern among mortgage market participants, consumer advocates, and policymakers regarding pervasive problems with

---

1 *See generally* Margaret R.T. Dewar, *Regulation X: A New Direction for the Regulation of Mortgage Servicers*, 63 Emory L. J. 175, 177–80 (2013) (providing background on the establishment of the Bureau and the consumer protection problems exposed by the 2007–08 financial crisis).

servicers' performance of loss mitigation activity in connection with the financial crisis, including lost documents, non-responsive servicers, and unwillingness to work with borrowers to reach agreement on loss mitigation options." 2013 Regulation X Amendments, 78 Fed. Reg. at 10814.

5. RESPA also imposes mandatory duties on mortgage servicers in responding to borrower inquiries. 12 U.S.C. § 2605(e).

6. Upon receipt of a qualified written request, § 2605(e)(2) requires the servicer to conduct an investigation and make appropriate corrections in the account of the borrower or provide the borrower with a written explanation of why the servicer believes the account is correct.

7. A servicer that fails to comply with the requirements of § 2605(e) is liable to the borrower for each failure for actual damages and, in the case of a pattern or practice of noncompliance, additional damages of up to $2,000. 12 U.S.C. § 2605(f).

8. These requirements and the corresponding civil liability were first added to RESPA in 1990 by the Cranston-Gonzalez National Affordable Housing Act as part of a broader effort to set a national housing policy so that every American family would be able to afford a decent home in a suitable environment. *See* Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101–625, §§ 101, 102, 941, 104 Stat. 4079 (1990).

9. Initially, RESPA required servicers to provide acknowledgment of a qualified written request within 20 days, but in responding to the 2007–08 financial crisis, Congress shortened the timeframe to 5 days. *See* 2013 Regulation X Amendments, *supra* at 10757. Additionally, Congress shortened the timeframe to provide a full investigative response from 60 days to 30 days. *Id.* at 10758.

10. As part of its response to the 2007–08 financial crisis, Congress further amended § 2605 by increasing penalties that servicers incur for violations of § 2605(e). *See id.* at 10709.

11. Thus, RESPA's protections, including § 2605(e), were specifically designed to ensure that borrowers have timely access to accurate information regarding their accounts, that borrowers are able to avoid unnecessary fees and charges, and that borrowers are able to explore all available options to avoid foreclosure of their homes. *See id.*

12. Plaintiff brings this action for actual damages, additional damages, costs, and attorneys' fees for Rushmore's multiple RESPA violations, including its failure to comply with Regulation X's mandatory loss mitigation procedures and for failing to properly respond to Plaintiff's Qualified Written Requests.

13. Rushmore's disorganization and disregard for RESPA and Regulation X's mandated procedures have caused Plaintiff significant actual damages, including significant emotional distress and the imminent foreclosure of her home of over 45 years.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 12 U.S.C. § 2605(f).  It has supplemental jurisdiction over her state law claim under 28 U.S.C. § 1367.

15. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

16. Plaintiff is a natural person residing in this District and Division.

17. Rushmore is a foreign limited liability company with a principal place of business in Irvine, California, which operates as a mortgage servicer in Virginia. It is a mortgage loan servicing company governed by RESPA.

## FACTS

### *Relevant Statutory Framework*

18. As the entities that perform the day-to-day management of loans on behalf of lenders and investors, "servicers can have a direct and profound impact on borrowers." 2013 Regulation X Amendments, 78 Fed. Reg. at 10699.

19. Borrowers are often faced with difficulties when the servicer of their loan "makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans." *Id.* In other words, even though a loan modification may be the best solution for both the borrower and the mortgage investors, the servicer is incentivized to foreclose as the process for foreclosure is systematic and inexpensive for the servicer. Dewar, *supra* note 1, at 188. Indeed, the Bureau's commentary on Regulation X notes, "It has been recognized in Inspector General reports, and the Bureau has learned from outreach with mortgage investors, that servicers may be acting to maximize their self-interests in the handling of delinquent borrowers, rather than the interests of owners or assignees of mortgage loans." 2013 Regulation X Amendments, 78 Fed. Reg. at 10701.

20. RESPA includes consumer financial protection purposes that address some of these issues, "including facilitating borrowers' review for loss mitigation options." *Id.* at 10815.

21. Consistent with the consumer protection purposes included in RESPA, Regulation X provides for certain loss mitigation procedures that servicers must follow. 12 C.F.R. § 1024.41.

22. The Bureau specifically designed the mandatory loss mitigation procedures to avoid the practice of processing home loan modifications contemporaneously with the foreclosure process—what is commonly referred to as "dual tracking." The potential harm to consumers from the practice of "dual tracking" has been recognized by the Bureau as "substantial." 2013 Regulation X Amendments, 78 Fed. Reg. at 10819. Thus, these requirements of Regulation X have been designed to ensure "that consumers in all jurisdictions have an opportunity to submit a complete loss mitigation application." *Id.* at 10820.

23. For example, Regulation X sets forth procedures that servicers are required to follow in receiving loss mitigation applications. Upon receipt of a loss mitigation application, a servicer is obligated to "promptly" review any loss mitigation application it receives 45 or more days before a foreclosure sale to determine if the application is complete. 12 C.F.R. § 1024.41.

24. Within 5 days of receiving the loss mitigation application, the servicer is required to send the borrower a written notification that includes the following: (1) that the servicer acknowledges receipt of the loss mitigation application; (2) that the servicer has determined the loss mitigation application is either complete or incomplete; and, (3) if the application is incomplete, the additional documents that are required to complete the application and a reasonable date by which the borrower should submit the documents and information necessary to make the application complete. 12 C.F.R. § 1024.41(b).

25. A servicer has an ongoing duty to "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b).

6

26. Regulation X also sets forth specific procedures that servicers must follow in evaluating loss mitigation applications. 12 C.F.R. § 1024.41(c). Critically, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, the servicer is required to evaluate the borrower for all available loss mitigation options and to provide the borrower in writing of its determination within 30 days of receiving the complete application.

27. Additionally, Regulation X restricts the commencement of foreclosure proceedings while a complete loss mitigation application is pending. 12 C.F.R. § 1024.41(f)(2).

28. Thus, through both its strict timelines and its prohibition on the commencement of foreclosure proceedings under certain circumstances, Regulation X seeks to "ensure that borrowers have a full and fair opportunity to receive an evaluation for a loss mitigation option before suffering the harms associated with foreclosure." 2013 Regulation X Amendments, 78 Fed. Reg. at 10815.

29. A borrower may enforce the loss mitigation procedures pursuant to § 6(f) of RESPA, 12 U.S.C. § 2605(f). 12 C.F.R. § 1024.41(a).

### *Plaintiff's Mortgage*

30. With her husband Nathaniel Jones, Plaintiff purchased her home in Essex County, Virginia on June 15, 1975.

31. Plaintiff has used her home as her primary residence since 1975.

32. On January 6, 2000, Mr. Jones passed away, making Plaintiff the sole owner of the property.

33. On June 1, 2004, Plaintiff executed a Deed of Gift, which granted title of the property to herself and her daughter, Virlene Tunstall, as joint tenants with the right of survivorship.

34. On January 24, 2006, Plaintiff and Ms. Tunstall entered into a mortgage with American General Financial Services, Inc., which was secured by their home in Essex County.

35. After taking out the mortgage, Plaintiff suffered from advanced arthritis, which left her unable to work, and Ms. Tunstall lost her job and was unable to find another. As a result of their financial hardships, Plaintiff and Ms. Tunstall had difficulty making the monthly mortgage payments.

### *Rushmore's Mishandling of Plaintiff's Mortgage*

36. In October 2019, Plaintiff applied for a loan modification with her mortgage servicer, Rushmore.

37. Rushmore responded to Plaintiff's loan modification application by stating that Plaintiff needed to provide additional documentation, including: proof of funds for a down-payment; proof of insurance; and one month of bank statements for all accounts of each loan holder.

38. Rushmore already had at least one of these documents—the proof of insurance—because the insurance on Plaintiff's home is lender-placed insurance.

39. Over the next eight months, Plaintiff submitted numerous additional documents regarding her loan modification application, including documents that she had previously submitted, which Rushmore asked her to resubmit or her modification application would be denied as incomplete.

40. Finally, on August 13, 2020, Rushmore confirmed to the Plaintiff by telephone that her loan modification application was complete and that it had received all the necessary documents to evaluate her application.

41. However, on August 28, 2020, Plaintiff called Rushmore again to inquire about her loan modification, and a Rushmore representative told her—in a direct contradiction to Rushmore's August 13 representations—that her application was incomplete.

42. Plaintiff was concerned about the conflicting information she received from Rushmore. As a result, on August 28, 2020, Plaintiff sent Rushmore a Qualified Written Request asking that Rushmore send her its guidelines for evaluating whether a loan modification application and the supporting documentation is considered complete, including who is responsible for the evaluations and the timelines for those documents.

43. In her Qualified Written Request, Plaintiff also requested that Rushmore provide its guidelines for evaluating borrowers for loss mitigation options that result in the retention of the home, and the requirements for a borrower to qualify for those options, particularly any specific guidelines from U.S. Bank.

44. Then, on August 31, 2020, Plaintiff received a notice from Rushmore dated August 21, 2020, stating that it was closing her file because it had not received all of the required documentation to evaluate her for a loan modification.

45. Because this letter predated her August 13 call with Rushmore, Plaintiff called Rushmore on September 3, 2020 to ask about the letter.

46. During this September 3, 2020 call, a Rushmore representative told Plaintiff that her loan modification application had been marked as complete, as they had indicated on August 13, 2020, and that Plaintiff did not need to submit any further documentation in order to be evaluated for a loan modification.

47. Despite Rushmore's representations, it did not evaluate Plaintiff for a loan modification. Instead, it continued with the foreclosure of her home. It scheduled a foreclosure sale for October 16, 2020 and started advertising the sale on September 16, 2020.

48. When Plaintiff learned of the sale, she called Rushmore. During this call, Rushmore informed the Plaintiff that her loan modification application was incomplete because she had not submitted proof of down payment funds or insurance documentation.

49. Again this was incorrect. The insurance was lender-placed insurance, so Rushmore had all the purportedly required proof of insurance. Even so, Plaintiff had already submitted these documents. It also had previously told her—on August 13 and September 3—that her application was complete.

50. In an attempt to have Rushmore's servicing error corrected, Plaintiff sent Rushmore a second Qualified Written Request on September 23, 2020 and asked it to investigate its servicing errors, including its false conclusion that her loan modification application was incomplete. She requested that Rushmore correct its errors and evaluate her for a loan modification.

51. In October 2020, Rushmore responded to both of Plaintiff's Qualified Written Requests. Rushmore's responses to Plaintiff's Qualified Written Requests, however, were deficient in several respects.

52. First, Rushmore did not provide any of the guidelines that Plaintiff had requested in order to determine what documents were missing from her loan modification application. It also did not explain why these documents were unavailable.

53. Rushmore also refused to conduct an investigation into Plaintiff's submitted loan modification application or why it had told her that the application was complete.

54. It also refused to correct its inaccurate conclusion that her loan modification application was incomplete or to evaluate her for a loan modification.

55. Instead, it merely stated that no error had occurred on her account.

56. Eventually, after calls with both Rushmore and BWW Law Group, the foreclosure sale was cancelled.

57. Desperate to save her home, Plaintiff submitted a second loan modification application on October 19, 2021.

58. Plaintiff submitted the loan modification application by email, so Rushmore received it that same day.

59. At the time that she submitted this application, no foreclosure sale was pending.

60. On October 21, 2021, Rushmore asked Plaintiff to send additional documents for her loan modification application.

61. Plaintiff complied with Rushmore's instructions and submitted all the requested documentation on November 17, 2021.

62. At no point did Rushmore provide notice that Plaintiff's loan modification application was complete as of November 17, 2021, nor did Rushmore send any notice requesting further documentation to Mrs. Jones.

63. Instead, Rushmore scheduled a second foreclosure sale for January 7, 2022.

64. Rushmore also sent Plaintiff a letter dated December 15, 2021, claiming that the application was incomplete, that the document submission deadline had passed, and that it would not offer Mrs. Jones a loan modification. Rushmore also falsely claimed that a complete application was not received more than 37 days before the scheduled foreclosure date, when in fact the completed application was received 51 days before the scheduled foreclosure date.

65. As of the date of this filing, the foreclosure sale is still scheduled to proceed on January 7, 2022.

66. As a result of Rushmore's improper servicing practices and conduct, Plaintiff has suffered significant actual damages, including emotional distress and out-of-pocket damages, including the costs of multiple illegal attempted foreclosure sales of her home. She also is facing the loss of her home for over 45 years and the loss of significant equity in the property.

## COUNT ONE:
## VIOLATION OF RESPA, 12 U.S.C. § 2605, 12 C.F.R. § 1024.41(b)

67. Plaintiff incorporates each of the preceding allegations.

68. With respect to Plaintiff's 2020 loan modification application, Rushmore violated RESPA, 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(b) by failing to exercise reasonable diligence in obtaining documents and information to complete both of Plaintiff's loss mitigation applications.

69. For example, Rushmore requested documents that it already had as a prerequisite to evaluate Plaintiff for loss mitigation, like the documents regarding the lender-place insurance that it had purchased for Plaintiff's property.

70. In addition, Rushmore also required Plaintiff to resubmit multiple documents that she had already submitted to Rushmore in order to evaluate her for a loan modification, including proof that she could make a down payment.

71. With respect to Plaintiff's 2021 loan modification application, Rushmore violated RESPA, 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(b)(1) by failing to acknowledge receipt of her loan modification application and provide her the appropriate notification regarding the status of her application.

72. In October 2021, Plaintiff submitted a loan modification application to Rushmore, which was supplemented in November 2021 per Rushmore's instructions.

73. Plaintiff's loan modification was complete on November 17, 2021, which was more than 45 days prior to the foreclosure sale date of January 7, 2022

74. Therefore, Rushmore violated RESPA, 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(b)(2)(B) by failing to notify Plaintiff of the following within 5 business days of receiving her 2021 loan modification application: (1) Rushmore's determination that the application was incomplete, (2) the documents and information required to complete the application, and (3) the date by which Plaintiff needed to submit the necessary documents and information to complete their application.

75. As a result of Rushmore's violations of 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(b), Plaintiff suffered actual damages under § 2605(f), including: the incurring of expenses and fees associated with her default on the mortgage and attempted foreclosure; damage to reputation; out-of-pocket expenses; embarrassment; humiliation; and other emotional distress. She is also facing the imminent foreclosure of her home and the loss of significant equity in her property.

76. Upon information and belief, this conduct was the result of Rushmore's standardized procedures regarding the processing of loan modification applications. Therefore, upon information and belief, discovery will reveal evidence that many additional consumers were subject to the same or similar conduct by Rushmore.

77. Accordingly, Rushmore's conduct appears to be a pattern and practice of misconduct. As a result, Rushmore is also liable to the Plaintiff for statutory damages of up to $2,000 for each violation of 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(b).

78. Plaintiff is also entitled to recover costs and attorneys' fees from Rushmore under to 12 U.S.C. § 2605(f).

**COUNT TWO:**
**VIOLATION OF RESPA, 12 U.S.C. § 2605, 12 C.F.R. § 1024.41(c)**

79. Plaintiff incorporates each of the preceding allegations.

80. Plaintiff submitted a loan modification application in October 2021. Rushmore determined the application was incomplete and requested that additional documentation be provided within 30 days to complete the application.

81. Plaintiff submitted all documents and information requested by Rushmore's letter on November 17, 2021—prior to the 30-day deadline.

82. Therefore, on November 17, 2021 and more than 37 days prior to any foreclosure sale of her home, Rushmore received a complete loss mitigation application from Plaintiff.

83. Rushmore violated RESPA, 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(c)(1) by failing to do the following within 30 days after receiving Plaintiff's complete loss mitigation application: (1) evaluate Plaintiff for all loss mitigation options available to her and (2) provide Plaintiff with notice in writing of Rushmore's determination of which loss mitigation options it would offer her.

84. Rushmore also violated RESPA, 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(c)(3) by failing to notify her within five days of receiving her complete loan modification application: that the loss mitigation application is complete; the date the servicer received the complete application; that the servicer expects to complete its evaluation within 30 days of the date it received the complete application; and that the borrower is entitled to certain foreclosure protections because the servicer has received the complete application.

14

85. As a result of Rushmore's violations of 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(c), Plaintiff suffered actual damages under § 2605(f), including: the incurring of expenses and fees associated with her default on the mortgage and attempted foreclosure; damage to reputation; out-of-pocket expenses; embarrassment; humiliation; and other emotional distress. She is also facing the imminent foreclosure of her home and the loss of significant equity in her property.

86. Upon information and belief, this conduct was the result of Rushmore's standardized procedures regarding the processing of loan modification applications. Therefore, upon information and belief, discovery will reveal evidence that many additional consumers were subject to the same or similar conduct by Rushmore.

87. Accordingly, Rushmore's conduct appears to be a pattern and practice of misconduct. As a result, Rushmore is also liable to the Plaintiff for statutory damages of up to $2,000 for each violation of 12 U.S.C. § 2605 and 12 C.F.R § 1024.41(c).

88. Plaintiff is also entitled to recover costs and attorneys' fees from Rushmore under 12 U.S.C. § 2605(f).

## COUNT THREE:
## VIOLATION OF RESPA, 12 U.S.C. § 2605(e)(1)

89. Plaintiff incorporates each of the preceding allegations.

90. Rushmore violated 12 U.S.C.§ 2605(e)(1)(A) by failing to acknowledge receipt of Plaintiff's September 23, 2020 Qualified Written Request within five days of receiving the correspondence.

91. As a result of Rushmore's violations of 12 U.S.C. § 2605(e), Plaintiff suffered actual damages, including out-of-pocket expenses and emotional distress. She also is facing the imminent foreclosure of her home and the loss of significant equity in her property.

92. Upon information and belief, Rushmore's noncompliance with 12 U.S.C. § 2605(e)(1) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e) because it is a result of Rushmore's standard policies and procedures. Therefore, upon information and belief, discovery will reveal that many additional consumers were subject to the same or similar conduct by Rushmore.

93. Accordingly, Rushmore's conduct appears to be a pattern and practice of misconduct. As a result, Rushmore is also liable to the Plaintiff for statutory damages of up to $2,000 for each violation of 12 U.S.C. § 2605(e)(1).

94. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorney's fees from Rushmore for each of its violations of 12 U.S.C.§ 2605(e)(1) under 12 U.S.C. § 2605(f).

## COUNT FOUR:
## VIOLATION OF RESPA, 12 U.S.C. § 2605(e)(2)

95. Plaintiff incorporates each of the preceding allegations.

96. Rushmore committed multiple violations of 12 U.S.C.§ 2605(e)(2), including: failing to conduct an adequate investigation in responding to Plaintiff's Qualified Written Request; failing to make appropriate corrections, including deeming the Plaintiff's 2020 loan modification as complete and evaluating her for a loan modification; failing to provide information requested by Plaintiff; and failing to provide any explanation for why the information requested by Plaintiff was not available.

97. Upon information and belief, Rushmore had information available to it demonstrating that Plaintiff had submitted a complete loan modification application and that its rejection of her application as incomplete was in error.

98. In violation of RESPA, Rushmore did not fulfill its investigative obligations under 12 U.S.C. §2605(e)(2).

99. SPS also violated 12 U.S.C. § 2605(e)(2) and 12 C.F.R. 1024.36 by failing to provide Plaintiff with its guidelines on loan modification applications that she had requested or explain why the information was unavailable.

100. As a result of Rushmore's violations of 12 U.S.C. § 2605(e)(2), Plaintiff suffered actual damages including: out-of-pocket expenses and other emotional distress.

101. Upon information and belief, Rushmore's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e) because it is a result of Rushmore's standard policies and procedures. Therefore, upon information and belief, discovery will reveal that many additional consumers were subject to the same or similar conduct by Rushmore.

102. Accordingly, Rushmore's conduct appears to be a pattern and practice of misconduct. As a result, Rushmore is also liable to the Plaintiff for statutory damages of up to $2,000 for each violation of 12 U.S.C. § 2605(e)(2).

103. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Rushmore for each of its violations of 12 U.S.C.§ 2605(e)(2) under 12 U.S.C. § 2605(f).

**COUNT FOUR:**
**FRAUD OR CONSTRUCTIVE FRAUD**

104. Plaintiff incorporates each of the preceding allegations.

105. As explained above, Rushmore made fraudulent representations to Plaintiff on August 13, 2020 and September 3, 2020, when it told her that her 2020 loan modification application was complete and that she did not need to submit any additional documentation.

106. In the alternative, Rushmore made the fraudulent representation with reckless abandon and intent for the truth.

107. Rushmore's representations were untrue, as evidenced by the fact that it later denied her loan modification application because she had not submitted all the required documentation.

108. Upon information and belief, Rushmore knew that its representations were untrue because it had Plaintiff's loan modification application and knew or should have known that it was missing required documentation.

109. It was reasonable for Plaintiff to rely on the misrepresentation because Rushmore is the servicer for her home loan and knew what documentation was required for a loan modification.

110. Plaintiff relied on Rushmore's misrepresentations and omission when deciding how to handle her mortgage. If Rushmore had told her more documentation was required, she would have submitted it.

111. If Plaintiff had known of Rushmore's misrepresentations or omission, she would have submitted additional documentation to support her loan modification application or explored additional avenues to prevent the foreclosure of her home.

112. Rushmore knew, or should have known, that Plaintiff was relying on its representations because Plaintiff told it that she was trying to save her home from foreclosure by obtaining a modification.

113. Rushmore's representations regarding the completeness of Plaintiff's loan modification application were false, as evidenced by the fact that Rushmore later denied the loan modification application because it was incomplete.

114. Rushmore made this false statement of material fact with the intent to deceive the Plaintiff so that it could foreclose on her home and collect default related fees associated with the foreclosure. Rushmore's actions were willful and done for its pecuniary benefit.

115. In the alternative, Rushmore negligently misrepresented the status of the foreclosure sale and is thus liable for constructive fraud.

116. As a result of Rushmore's conduct, actions and inaction, Plaintiff suffered actual damages, including the imminent loss of significant equity in her home, the assessment of foreclosure fees, the imminent foreclosure of her property, embarrassment; humiliation; and other emotional distress associated with the foreclosure sale.

117. Plaintiff is entitled to recovery of these actual damages. She is also entitled to punitive damages because Rushmore's conduct was willful, wanton, malicious, and deliberate.

118. In the alternative, if Rushmore made the misrepresentations identified above innocently or negligently, Rushmore made those misrepresentations with the intent that Plaintiff rely on those representations.

119. Plaintiff relied on Rushmore's representations to her detriment, and she has suffered damages due to Rushmore's conduct including, but not limited to: (1) loss of significant equity in her property; (2) the future value and equity in the property; (3) embarrassment; humiliation; and other emotional distress associated with the foreclosure sale; and (4) expenses and costs attributed to the foreclosure, as described above.

WHEREFORE, Plaintiff demands judgment for actual, statutory, and punitive damages against Rushmore; her attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and such other relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**VIRGIE PAULINE JONES**

By:    */s/ Kristi C. Kelly*
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com

Alexander Joseph Reidell, VSB # 89513
Legal Aid Works
500 Lafayette Blvd., Suite 100
Fredericksburg, VA 22401
Tel: (540) 371-1105
Fax: (540) 371-1114
areidell@legalaidworks.org

*Counsel for Plaintiff*